**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**July 27, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

MEDIANEWS GROUP, INC.; and
KEARNS-TRIBUNE, L.L.C.,

      Plaintiffs - Counterdefendants -
      Appellees,

v.

PHILIP G. McCARTHEY; THOMAS
K. McCARTHEY; SARAH J.
McCARTHEY; SHAUN P.
McCARTHEY; and MAUREEN P.
McCARTHEY,

      Defendants - Counterclaimants,
      Third-Party Plaintiffs -
      Appellants.

v.

DESERET NEWS PUBLISHING
COMPANY; DESERET
MANAGEMENT CORPORATION;
AT&T CORPORATION; COMCAST
CORPORATION; DIRKS, VAN
ESSEN & MURRAY; R. GARY
GOMM; and JOHN/JANE DOES 1-25,

      Third-Party Defendants -
      Appellees.

No. 06-4132

---

**Appeal from the United States District Court**
**for the District of Utah**

Sean Connelly, Reilly Pozner & Connelly, Denver, Colorado (Thomas R. Karrenberg, Anderson & Karrenberg, Salt Lake City, Utah; E. Barney Gesas and Jennifer A. James, Clyde Snow Sessions & Swenson, Salt Lake City, Utah with him on the briefs), for Defendants - Appellants/Third-Party Plaintiffs.

Kevin T. Baine, Williams & Connolly, Washington, D.C. and David J. Jordan, Stoel Rives, Salt Lake City, Utah (James S. Jardine and Alan T. Brinkerhoff, Ray Quinney & Nebeker, Salt Lake City, Utah; Jill M. Pohlman, Stoel Rives LLP, Salt Lake City, Utah; Todd M. Shaughnessy, Snell and Wilmer, Salt Lake City, Utah; Paul B. Gaffney and Jennifer G. Wicht, Williams & Connolly, Washington, D.C.; and R. Willis Orton, Kirton & McConkie, Salt Lake City, Utah, with them on the briefs), for Plaintiffs - Counterdefendants - Appellees.

Before **KELLY**, **HENRY**, and **LUCERO**, Circuit Judges.

**LUCERO**, Circuit Judge.

Philip, Thomas, Sarah, Shaun, and Maureen McCarthey (the "McCartheys") seek to enforce a collateral oral agreement allegedly guaranteeing their individual right to repurchase The Salt Lake Tribune ("Tribune") from its current owner, MediaNews Group, Inc. ("MediaNews"), for fair market value. Because the McCartheys' oral contract claims are superceded by written contracts to substantially the same effect, they are barred by the parol evidence rule and the statute of frauds. Accordingly, we conclude that the district court properly dismissed their claims. Exercising jurisdiction under 28 U.S.C. § 1291, we

2

**AFFIRM**.

I

From 1901 until 1997, descendants of Senator Thomas Kearns controlled Salt Lake City's largest daily newspaper, the Tribune, through their collective ownership of shares in the Kearns-Tribune Corporation ("KT"), a holding company for the newspaper and other assets.[1]  Although ownership of KT grew more diffuse over the years, the McCarthey family retained the largest block of its stock, comprising approximately 39% of all outstanding shares.  These shares were held individually and in trust by Jane McCarthey and her five children.  For all practical purposes, ownership of those shares allowed the McCarthey family to veto prospective changes to the ownership and operation of the Tribune.  In addition, three of the McCarthey siblings, Philip, Sarah, and Thomas, served on the KT Board of Directors.

Family control of the paper persisted for decades, in part because some Kearns descendants felt an obligation to maintain the Tribune's role as an independent voice in Utah.  Long-time KT executive and McCarthey family advisor Jack Gallivan was explicitly entrusted with the duty to maintain the

---

[1] KT has owned the Tribune since the 1950s, but family control of the paper extends back to the turn of the century.

Tribune's independence by Jennie Kearns, widow of Senator Kearns. Yet by 1995, if not somewhat earlier, a series of developments drove the family to sell their stake in KT. Over the years, the value of KT stock had risen exponentially, primarily due to KT's ownership of a founding stake in Tele-Communications, Inc. ("TCI"). Gallivan was instrumental in the decision to invest in TCI, and he maintained a close relationship with TCI's founders, John Malone and Robert Magness, throughout the company's meteoric rise from a tiny Western cable and microwave operator into one of the largest telecommunications companies in the United States. By the mid-1990s, KT's stake in TCI was worth several hundred million dollars and exceeded the value of all of KT's other assets combined, including the Tribune. However, KT could not easily liquidate that stake because the shares were largely in the form of unmarketable "Super-B" voting stock. Moreover, KT shareholders could only sell their shares to other shareholders or back to the corporation, which had limited funds to buy shares. These restrictions on sale were one of several aspects of KT's ownership structure designed to maintain family control of the company. Thus, although KT shares were valuable on paper, there was little shareholders could do to realize those gains. In addition, as several major shareholders (notably Jane McCarthey) grew older, the family sought greater liquidity in order to reduce its massive potential estate tax exposure. Finally, TCI itself wanted to buy KT's "Super-B" shares for reasons

4

related to corporate control.

Starting in 1995, these developments prompted Gallivan, Malone, and Magness to propose a merger of KT into TCI in exchange for readily marketable TCI common stock. From the start, all three men understood that continued McCarthey family control of the Tribune was a precondition to any merger. Whereas other KT shareholders were less committed to control of the Tribune, the McCartheys were adamant about preserving family ownership.

Despite the assurances provided by Gallivan to the McCartheys that they would retain control of the Tribune after the merger, they remained deeply skeptical. When TCI presented a merger plan to the KT Board in January 1997, the McCartheys alone opposed it. That rejection prompted renewed negotiations between the McCartheys, Gallivan, Malone, and other KT and TCI principals. The end result of those negotiations was a switch in the McCartheys' position toward the merger, such that they voted in February and April of 1997 to approve it.

A set of written documents memorialized the merger: (1) the Voting Agreement, which committed several of the largest KT shareholders to vote their shares in favor of the merger; (2) the Merger Agreement, which set forth the terms under which the two companies would merge; (3) the Proxy Statement, which was provided to all KT shareholders, and described the terms and intended

5

results of the proposed merger; (4) the Option Agreement, which provided a newly organized company, Salt Lake Tribune Publishing Company, L.L.C. ("SLTPC"), with an option to purchase the Tribune from KT in five years, under certain terms; and (5) the Management Agreement, which gave SLTPC the right to manage the Tribune during the five-year period before the right to repurchase vested. TCI and the relevant shareholder signatories entered into the Voting Agreement on April 18, 1997, and the Merger Agreement was executed the same day. KT and SLTPC then entered into the Option and Management Agreements on July 31, 1997. The Voting Agreement, Option Agreement, and Management Agreement all contain integration clauses. Collectively, the written agreements represent a finely calibrated, thoroughly lawyered attempt to ensure the McCartheys' right to enjoy uninterrupted control of the Tribune, and to regain ownership at the end of five years, while still abiding by rules governing a 26 U.S.C. § 368 tax-free merger under the tax code and relevant regulations.

In 1999, TCI merged with AT&T Corporation. Soon thereafter, AT&T decided that ownership of the Tribune did not fit with its strategic goals, and began exploring its options to sell the paper. Deseret News Publishing Company ("DNPC"), publisher of the Deseret News, the Tribune's primary competitor in the Salt Lake City market, considered purchasing the Tribune from AT&T. Both papers had operated since 1952 under a Joint Operating Agreement ("JOA"),

6

which provided for shared ownership of most of the plant and equipment used to produce the two papers, as well as consolidated business operations. The Newspaper Agency Corporation ("NAC") was formed to implement the JOA, and its ownership is split between KT and DNPC. DNPC, owned by the Church of Jesus Christ of Latter-day Saints, sought ownership of the Tribune for both economic and political reasons. The record demonstrates the Church instructed Glen Snarr, publisher of the Deseret News, to pursue assiduously what it viewed as an historic opportunity to remove a source of negativity toward the Church. Snarr and other DNPC executives also believed the profitability of the Deseret News could be improved if DNPC enjoyed full control of the NAC.

For a variety of reasons ancillary to this appeal, DNPC was unsuccessful in its efforts to acquire the Tribune. Instead, AT&T sold the Tribune to MediaNews, a Denver-based newspaper conglomerate, for $200 million in January 2001. SLTPC sought an injunction blocking this sale, but the district court refused to grant the injunction, in part because it found that the sale documents protected SLTPC's rights under the Management and Option Agreements. Nevertheless, MediaNews and DNPC then sought to defeat the Option Agreement through a series of amendments to the JOA, which would give DNPC the right to block any sale of the Tribune back to the McCartheys. After substantial litigation, this court held that the amendments would not prevent MediaNews from performing most of

7

its obligations under the Option Agreement.  See Salt Lake Tribune Publ'g Co., L.L.C. v. AT&T Corp., 320 F.3d 1081, 1101 (10th Cir. 2003) [hereinafter the "AT&T case"].[2]

Having largely vindicated their right to buy back the assets of the Tribune, the McCartheys, through SLTPC, formally exercised their purchase option. Pursuant to the Option Agreement, the parties each appointed appraisers to value the Tribune in 2002.  The two appraisers arrived at dramatically different valuations – $218 million from SLTPC's appraiser and $380 million from MediaNews' appraiser.  Under the terms of the Option Agreement, a third appraiser, Management Planning, Inc., was appointed, and its appraisal value was averaged with the closest of the two original appraisal values, resulting in a final valuation of $355.5 million.  SLTPC then brought suit to challenge that valuation, which has been before this court twice on appeal, and is still pending.  See Salt Lake Tribune Publ'g Co., L.L.C. v. Mgmt. Planning, Inc., 390 F.3d 684 (10th Cir. 2004); Salt Lake Tribune Publ'g Co., L.L.C. v. Mgmt. Planning, Inc., 454 F.3d 1128 (10th Cir. 2006).

In the present case the McCartheys assert an independent, individual right

---

[2] We held in the AT&T case that the restriction on transferring NAC stock, while enforceable under Utah law, did not bar SLTPC from exercising its right under the Option Agreement to purchase all of the Tribune's assets except the NAC stock.  See 320 F.3d at 1101.

to reacquire the Tribune, which derives from an alleged oral agreement made between Gallivan, Malone, Magness, Donne Fisher (former TCI Chief Financial Officer), and Dominic Welch (former Tribune Publisher and KT Board member) during the period preceding the merger.  This handshake deal is termed the "Family Agreement," and is alleged to consist of four interlocking, "ironclad" promises conveyed by Gallivan, on behalf of TCI, to the McCartheys.  These promises, as described in the McCartheys' briefs, include the following:  (1) "The Tribune would be held by TCI as a special asset and not be materially changed"; (2) "An option to purchase the Tribune would be given to a company yet to be created by interested KT shareholders"; (3) "Until return of the Tribune, the newly created company would manage the Tribune"; and (4) "The Tribune would be sold back to the newly created company by TCI/KT under reasonable valuation methodologies."  In consideration of these guarantees, the McCartheys allegedly pledged to vote their KT shares in favor of the merger.

All four of the surviving principals to the Family Agreement have testified to the existence of some form of prior oral agreement.[3]  Those principals have testified to the atmosphere of mutual trust and respect that pervaded the negotiations.  According to Malone and Gallivan, TCI intended to return the Tribune to the McCartheys at the end of five years, when the Management

_____

[3] Magness died in November 1996.

9

Agreement expired. Importantly, those principals also testified, in remarkably similar terms, to their intent to reduce the Family Agreement to writing.

In November 2001, the McCartheys filed suit in Colorado state court seeking to enforce the collateral, oral representations that constitute the Family Agreement. Litigation was stayed pending resolution of the AT&T case. On February 14, 2003, MediaNews brought the instant action, seeking a declaratory judgment that the McCartheys have no independent rights in the Tribune outside those set forth in the Option Agreement. The McCartheys answered and counterclaimed on November 9, 2004, alleging breach of contract, promissory estoppel, unjust enrichment, and several tort claims. They also named several others as third party defendants.[4] MediaNews and the third party defendants subsequently moved to dismiss for failure to state a claim, or in the alternative, for summary judgment. On July 8, 2005, the McCartheys unsuccessfully moved for expanded discovery pursuant to Fed. R. Civ. P. 56(f), and on April 24, 2006, the district court granted defendants' motions as to all claims. This appeal by the McCartheys follows.

## II

Two questions stand at the heart of this case: (1) whether the Family

---

[4] These include AT&T, DNPC, Desert Management Corporation, Comcast Corporation, R. Gary Gomm, and Dirks, Van Essen & Murray (collectively "third party defendants").

Agreement exists as a collateral oral agreement; and (2) whether, if it exists, the agreement is enforceable. Because this is a diversity case, we apply the substantive law of the forum state, Utah, when answering those questions. See Ahrens v. Ford Motor Co., 340 F.3d 1142, 1145 (10th Cir. 2003). We review the district court's grant of summary judgment de novo, applying the same legal standard employed by the district court. Mountain W. Mines, Inc. v. Cleveland Cliffs Iron Co., 470 F.3d 947, 950 (10th Cir. 2006). "Summary judgment is appropriate only where there is no genuine issue of material fact and one party is entitled to judgment as a matter of law." Id.; see Fed. R. Civ. P. 56(c). We apply the same de novo standard of review to dismissals under Fed. R. Civ. P. 12(b)(6), and accept all well-pleaded factual allegations in the complaint as true. See Park Univ. Enters., Inc. v. Am. Cas. Co. of Reading, 442 F.3d 1239, 1244 (10th Cir. 2006).

## A

As an initial matter, we note that the parties dispute what the district court held with respect to the existence of the Family Agreement. As characterized by the McCartheys, the district court erred in holding, as a matter of law, that the Family Agreement did not exist. As characterized by MediaNews and the third party defendants, the district court accepted the existence of the Family Agreement for purposes of summary judgment, but held that it did not survive as

11

a collateral agreement.  Although there is some ambiguity in the district court's order on this point, we need not reach the issue.  Counsel for MediaNews conceded the existence of the Family Agreement in some form at oral argument before this court, but maintained that the oral agreement was integrated into the written agreements.  Recognizing that the contours of the Family Agreement, as described by the McCartheys and the principals involved in its negotiation, have shifted somewhat over time, we nonetheless accept its existence for purposes of this appeal.[5]

Assuming the agreement's existence, the McCartheys must overcome the substantial hurdle posed by the integration clauses contained in the Option, Management, and Voting Agreements.  It is undisputed that the written agreements cover all four terms in the Family Agreement, as alleged by the McCartheys.  As to the first and third terms, that "[t]he Tribune would be held by TCI as a special asset and not be materially changed" and "[u]ntil return of the Tribune, the newly created company would manage the Tribune," these are precisely the rights conveyed to SLTPC under the Management Agreement.  As to the second and fourth terms, that "[a]n option to purchase the Tribune would be given to a company yet to be created by interested KT shareholders" and "[t]he

---

[5] Nor need we address the murky question of whether Gallivan had authority to bind TCI or KT to their obligations under the Family Agreement.

Tribune would be sold back to the newly created company by TCI/KT under reasonable valuation methodologies," it is undisputed that the Option Agreement grants SLTPC a right to repurchase the Tribune and provides for a valuation methodology should the option be exercised. Moreover, all surviving principals to the Family Agreement stated that they intended to reduce their oral agreement to writing through the Option and Management Agreements.[6] None testified to the existence of a separate oral agreement that was intended to survive

[6] During deposition, Gallivan was asked by counsel, "Did you understand that the whole idea of the merger agreement, the management agreement, and the option agreement was to put down in writing the substance of the agreements that had been reached?" He responded, "To put into writing [sic] assurance, ironclad assurance that the Salt Lake Tribune would remain in the control of the Kearns family."

Malone offered the following deposition testimony: "The best way to describe it was, the principals . . . had an understanding of what we were trying to accomplish, and hopefully we communicated that thoroughly to the attorneys on both sides, and the documents reflected that. . . . The clear intent of the parties, okay, was – is largely reflected in these documents."

Welch testified that he understood TCI would "build a fence" around the KT assets, and that KT's and TCI's "in-house and outside legal counsel were instructed and presumed by all of us to have prepared legal documents that would adequately and fully reflect our mutual understandings and agreements. These understandings included the promises and assurances that Mr. Gallivan provided separately to the McCartheys to induce them to change their opposition to a merger with TCI, to approve the merger with TCI, and to convey all of the McCarthey Family's holdings and interests in the KT stock to TCI."

In an affidavit prepared for the AT&T case, Fisher stated: "I understood that the Management and Option Agreements with [SLTPC] were an essential component to the proposed merger of Kearns-Tribune and TCI. The agreements between Kearns-Tribune and SLTPC . . . were designed to work in unison to allow these Kearns family [sic] uninterrupted management and protection of all assets related to the operation of The Tribune until the Option came due."

13

independent of the written agreements.

Under Utah law, the parol evidence rule "operates in the absence of fraud to exclude contemporaneous conversations, statements, or representations offered for the purpose of varying or adding to the terms of an integrated contract." Union Bank v. Swenson, 707 P.2d 663, 665 (Utah 1985). In cases such as the one at bar, in which the evidence demonstrates that the relevant written contracts were integrated, "the integrity of [the] written contract is maintained by not admitting parol evidence to vary or contradict the terms of the writing." Id. "Parol evidence is not so much inadmissible to vary the terms of an integrated writing as it is irrelevant, because the later agreement discharges the antecedent ones in so far as it contradicts or is inconsistent with the earlier ones." Novell, Inc. v. Canopy Group, Inc., 92 P.3d 768, 772 (Utah Ct. App. 2004) (quotation omitted).

The McCartheys deploy a set of arguments to defeat this general rule, none of which are availing. They first argue that Utah law treats the question of integration as one of fact, which is inappropriate for resolution on summary judgment. See Peterson v. Sunrider Corp., 48 P.3d 918, 927 n.10 (Utah 2002). Yet it is equally true that in the absence of disputed facts, integration may be determined on summary judgment. See Smith v. Osguthorpe, 58 P.3d 854, 858 (Utah Ct. App. 2002). Moreover, Utah courts "apply a rebuttable presumption that a writing which on its face appears to be an integrated agreement is what it

14

appears to be." Id. at 857 (quotation omitted). We agree with the district court that the McCartheys have not provided evidence to rebut this presumption.

Next, the McCartheys argue that they are not in privity with the signatories of the Option and Management Agreements, because they are not parties to those agreements. Parol evidence is inadmissible only in an action founded upon a written agreement "between the parties or privies thereto." Garrett v. Ellison, 72 P.2d 449, 451 (Utah 1937). The McCartheys argue that they are not "identified in [legal] interest" with SLTPC, and thus the parol evidence rule is inapplicable. See Searle Bros. v. Searle, 588 P.2d 689, 691 (Utah 1978). This argument appears disingenuous. During the period leading up to the merger, the McCartheys insisted upon, and eventually secured, rights unavailable to other KT shareholders. They created SLTPC for the precise purpose of exercising their rights under the Option and Management Agreements. By voting their shares in favor of the merger, they unequivocally signaled their satisfaction with the consideration received pursuant to the merger, including both TCI stock and SLTPC's rights under the Management and Option Agreements.

Finally, the McCartheys argue that the Family Agreement is a collateral oral agreement that falls outside the ambit of the parol evidence rule. Under Utah law, a collateral oral agreement may survive a writing if it is "not inconsistent with nor in repudiation of the terms of the written agreement." FMA Fin. Corp.

15

v. Hansen Dairy, Inc., 617 P.2d 327, 329 (Utah 1980). In their briefs on appeal, the McCartheys insist that the Family Agreement not only benefits different parties than the written agreements, but also provides greater rights than the written agreements. As we understand their argument, the McCartheys claim that the Family Agreement contains "[a] guarantee of performance running to the McCartheys" of a "grander scope" than that secured under the written agreements. They argue that, under Utah law, such a guarantee might properly be preserved as collateral, particularly if made in a context in which handshake deals were the norm and mutual trust pervasive. We are unconvinced.

An implied covenant of good faith and fair dealing is read into most, if not all, written agreements governed by Utah law. St. Benedict's Dev. Co. v. St. Benedict's Hosp., 811 P.2d 194, 199 (Utah 1991). Accordingly, to the extent that the only additional guarantee in the Family Agreement is that the parties would perform the written agreements in good faith, that guarantee is not properly labeled "collateral" at all. To the extent the McCartheys claim that the "grander scope" of the Family Agreement includes a guarantee that the McCartheys would be able to repurchase the Tribune five years after the merger, we reject this argument. Allowing such a guarantee to survive as collateral would surely trigger the unemployment of scores of transactional attorneys, as no written agreement

16

would be safe from attack.[7]  Under Utah's parol evidence rule, all terms of the Family Agreement were integrated into the written contracts, and are therefore superceded by those agreements.

**B**

Even if the Family Agreement were to survive as a collateral oral agreement, we affirm the judgment of the district court that the statute of frauds acts as an independent bar to its enforcement.  As alleged, the Family Agreement contains terms that cannot be performed within one year of acceptance.  As such, it falls within the reach of Utah's statute of frauds.  See Utah Code § 25-5-3 (governing leases and contracts for interest in lands) & -4 (governing any other agreement "that by its terms is not to be performed within one year from the making of the agreement"); Coulter & Smith, Ltd. v. Russell, 976 P.2d 1218, 1221-22 (Utah Ct. App. 1999) (holding option agreements are subject to the Utah statute of frauds).

Relying on § 25-5-8 of the Utah Code, the McCartheys claim that the

_____

[7] Moreover, the McCartheys allegedly agreed to reduce their chances of repurchasing the Tribune to gain certain tax benefits.  As initially conceived, the Option Agreement included certain terms that might have further safeguarded SLTPC's repurchase rights at fair market value, but the McCartheys consented to removing those terms in order to ensure tax-free treatment of the merger.  In arguing that they were beneficiaries of a collateral oral agreement providing for a stronger guarantee of performance under the Option Agreement, they simply ignore those allegations.

17

statute of frauds does not apply to the Family Agreement because it has been partially performed.  See Utah Code § 25-5-8 ("Nothing in this chapter contained shall be construed to abridge the powers of courts to compel the specific performance of agreements in case of part performance thereof.").  Utah courts have established a three-part test for removal of an oral contract from the reach of the statute of frauds on grounds of part performance:  "(1) the oral contract and its terms must be clear and definite; (2) the acts done in performance of the contract must be equally clear and definite; and (3) the acts must be in reliance on the contract."  Spears v. Warr, 44 P.3d 742, 751 (Utah 2002) (abrogated on other grounds by RHN Corp. v. Veibell, 96 P.3d 935 (Utah 2004)).  To mitigate the inherent uncertainty associated with oral contracts, "evidence of partial performance must be strong" and "acts of part performance must be exclusively referable to the contract."  Spears, 44 P.3d at 751 (quotation and alteration omitted).  "The reason for such requirement is that the equitable doctrine of part performance is based on estoppel and unless the acts of part performance are exclusively referable to the contract, there is nothing to show that the plaintiff relied on it or changed his [or her] position to his [or her] prejudice."  Id. (quotation omitted).

In light of their position on appeal that the Family Agreement's terms overlap substantially, if not completely, with the written agreements, the

18

McCartheys struggle to satisfy the "exclusively referable" requirement of Spears. Part performance, they argue, is established by their: (1) withdrawal of their opposition to the merger, (2) entry into the Voting Agreement, (3) actions in forming SLTPC, (4) setting aside of $200 million to exercise their option, and (5) support of SLTPC's exercise of its repurchase right under the Option Agreement. In addition, they point to Philip, Thomas, and Sarah McCartheys' decisions, as KT Directors, to vote in favor of the merger (and vote their shares individually) as evidence of part performance. "None of these acts," they argue, "would have been performed absent the Family Agreement."

Yet all of these actions are consistent with performance of the written agreements. Actions which are "equally consonant" with written agreements cannot form the basis of a finding of part performance, because they do not indicate the existence of a separate oral agreement upon which the parties relied. See Martin v. Scholl, 678 P.2d 274, 276-77, 279 (Utah 1983). Contrary to the McCartheys' assertion, nothing in Spears compels us to exempt their claim from the statute of frauds. In that case, the Utah Supreme Court relaxed the "exclusively referable" requirement in the face of "overwhelming independent evidence of the oral contracts." 44 P.3d at 752. Here, no such independent evidence exists. Whereas in Spears the defendants engaged in a variety of actions that could only be explained by the existence of an oral contract, see id., in this

19

case there is substantial doubt that many of those who would fulfill the promises in the Family Agreement even knew about it, much less relied upon it to the exclusion of the written agreements. The judgment of the district court on this point is affirmed.

### III

In addition, the McCartheys bring a variety of tort claims against several third party defendants. Those claims include: (1) interference with contract, (2) interference with prospective economic advantage, (3) civil conspiracy to interfere with contract, and (4) aiding and abetting interference with contract.[8] Third party defendants argue that these claims are predicated on the existence of the Family Agreement, and that its existence terminated with its integration into the Option and Management Agreements. Indeed, the McCartheys conceded before the district court that their tort claims were dependent upon the survival of the Family Agreement as a collateral oral agreement. As we held supra, the integration clauses in the written agreements are valid, and therefore the Family Agreement is superceded by the written agreements.[9]

---

[8] In their brief on appeal, the McCartheys do not address the district court's dismissal of their equitable claims of promissory estoppel and unjust enrichment, thus we deem any objection to the district court's dismissal of those claims to be waived. See Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 679 (10th Cir. 1998).

[9] Notwithstanding their concession on this point below, the McCartheys now make a half-hearted argument that even if we hold the parol evidence rule

(continued...)

20

Moreover, despite their arguments to the contrary, the statute of frauds also bars the McCartheys' tort claims. According to the McCartheys, the majority of jurisdictions abide by the rule that "contracts which are voidable by reason of the statute of frauds . . . can still afford a basis for a tort action when the defendant interferes with their performance." See Prosser & Keaton on Torts § 129 (5th ed. 1984) (citation omitted). Utah, however, is not one of those jurisdictions. Rather, in Utah the statute of frauds "bars those tort claims that require an oral contract as an essential element to maintaining the claim." Fericks v. Lucy Ann Soffe Trust, 100 P.3d 1200, 1205 (Utah 2004) (quotation omitted). All of the McCartheys' tort claims hinge on the McCartheys' rights under the Family

---

[9](...continued)
bars enforcement of the Family Agreement, "the parol evidence rule does not preclude the McCartheys from submitting evidence of the Family Agreement for purposes of its tort claims." They cite American Crystal Sugar Co. v. Nicholas, 124 F.2d 477, 479 (10th Cir. 1941), for the proposition that the parol evidence rule "applies only in controversies between parties to the instrument and those claiming under them." American Crystal Sugar says nothing in contradiction of the general rule that a prior agreement is discharged by a valid integration, see Novell, 92 P.3d at 772; Restatement (Second) of Contracts § 215, cmt. a ("A binding integrated agreement discharges inconsistent prior agreements, and evidence of a prior agreement is therefore irrelevant to the rights of the parties when offered to contradict a term of the writing."). Rather, that case addresses whether the parol evidence rule applies to a party that is a stranger to an existing instrument. See Am. Crystal Sugar, 124 F.2d at 479-80 ("Here, the United States was a stranger to the contract. It asserts a tax liability, not a claim derived from either party to the contract, and it could not invoke the parol evidence rule."). In this case, the McCartheys are not strangers to the Family Agreement, and therefore the parol evidence rule bars their tort claims for the same reasons that it bars their contract claims.

21

<u>Agreement</u>, thus the Family Agreement is an "essential element" required to maintain those claims. <u>Cf</u>. <u>id</u>. (holding plaintiffs' tort claims not barred by statute of frauds because they "do not rely on any rights" created by oral contract). We affirm the district court's dismissal of the McCartheys' tort claims.

**IV**

The McCartheys argue the district court erred in denying their request for additional discovery pursuant to Fed. R. Civ. P. 56(f). "We review a district court's denial of a Rule 56(f) motion for an abuse of discretion." <u>Comm. for First Amendment v. Campbell</u>, 962 F.2d 1517, 1522 (10th Cir. 1992). In their memorandum in support of their motion for Rule 56(f) relief, the McCartheys allege that the affidavit of Thomas Karrenberg details a number of "probable facts" that would go toward proving their claims. Having reviewed the Karrenberg affidavit and the district court's order denying additional discovery, we are satisfied that the court did not abuse its discretion.

In this case, the McCartheys were generally limited to discovery already taken in the <u>AT&T</u> case, which included depositions from all of the principals to the Family Agreement. In those depositions, Malone, Gallivan, and the other surviving principals were asked questions directly related to the Family Agreement and their intent with respect to the written agreements. In addition, the McCartheys submitted several new affidavits from principals to the Family

22

Agreement. The facts sought to be discovered, as described in the Karrenberg affidavit, go almost entirely to MediaNews' and the third party defendants' interference with the Family Agreement. Accordingly, "additional discovery would be of marginal utility" in this case, and the district court did not abuse its discretion in denying the McCartheys' request for Rule 56(f) relief. See Burke v. Utah Transit Auth., 462 F.3d 1253, 1264 (10th Cir. 2006).

## V

Any rights to reacquire the Tribune orally guaranteed to the McCartheys were integrated into the Option Agreement, and therefore must be pursued under the terms of that agreement. The judgment of the district court is **AFFIRMED**.