**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 7, 2011**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

CAROL KLINE,

       Plaintiff-Appellant,

v.

UTAH ANTI-DISCRIMINATION AND
LABOR DIVISION,

       Defendant-Appellee.

No. 10-4082

(D.C. No. 2:08-CV-00107-TC)
(D. Utah)

---

**ORDER AND JUDGMENT**[*]

---

Before **BRISCOE,** Chief Judge, **McKAY** and **KELLY**, Circuit Judges.

---

Plaintiff Carol Kline sued her former employer the Utah Anti-Discrimination

Division (UALD) under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 *et*

*seq.* Kline appeals the district court's grant of UALD's motion for summary judgment on

her claims for hostile work environment, sex discrimination, retaliation, and breach of

contract. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm.

---

[*] This order and judgment is not binding precedent, except under the doctrines of
law of the case, res judicata, and collateral estoppel. It may be cited, however, for its
persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

*Factual Background*

Kline was employed as an anti-discrimination investigator at UALD from May 1998 until August 2005. As an investigator, Kline was primarily responsible for preparing written reports analyzing the facts and legal merit of discrimination complaints filed with UALD. When Kline finished a memo analyzing a discrimination claim, her work was reviewed by her case manager and then submitted to the UALD Director for formal approval and issuance. App. at 165.

A. *Kline's Work History*

Between 1998 and 2004, Kline received eight separate "employee evaluations." Id. at 324. Five of the evaluations were part of her annual review, two were performance reviews, and one was a probationary review. In these evaluations, Kline was eligible for one of four performance ratings: unsuccessful; successful; highly successful; or exceptional. Id. at 225. Kline was given a rating of "successful" on seven of her reviews and "highly successful" on the other review. Id. at 324.

1. *Deidre Marlowe*

Although Kline's performance reviews up to 2004 indicated that she was performing in an acceptable manner, her case managers consistently noted shortcomings in her work product. In December 1999, Kline's case manager, Deidre Marlowe, gave Kline a memo documenting the problems with a case analysis she had completed. Id. at 62-63. Two months later, Marlowe placed a memo in Kline's file indicating that Kline

2

was having "trouble following instructions or remembering instructions given." Id. at 65. Marlowe also noted that there were many "factual and analytical gaps" in Kline's writing and that she was having difficulty following instructions given to her at previous meetings. Id. at 65-66. Marlowe stated in the memo that she had also identified these shortcomings in a discussion with Kline.

Two weeks later, Marlowe sent an email to Joseph Gallegos, the UALD Director at the time, informing him that she did not "trust [Kline's] analysis." Id. at 68. Three days later, Marlowe sent Gallegos another letter indicating that she had to return Kline's work for correction despite the fact that she had given Kline specific directions regarding the project. Id. at 70. In March 2000, Marlowe sent an email to Gallegos complaining that she had to continually ask Kline to re-write her memoranda. Id. at 75. Around the same time, Marlowe sent a memo to Kline in which she expressed concern regarding Kline's failure to follow instructions, inability to weigh evidence under the proper standard of proof, failure to understand the elements of a prima facie discrimination claim, and questionable analytical abilities. Id. at 77-78.

   2.     *John Golom*

John Golom was Kline's case manager from March 2000 until August 2002. Like Marlowe, Golom expressed concern regarding Kline's analytic and writing abilities. In July 2000, Golom sent a memo to Director Gallegos informing him that he had to return a project to Kline because it was "clearly incomplete" and needed significant revisions. Id. at 86. In August 2000, Golom placed a memo in Kline's file indicating that he had met

3

with Kline to discuss the shortcomings in her work and what she needed to do to correct them. Id. at 89.

In October 2000, Kline was placed on a corrective action plan (CAP) for a three-month period. Id. at 91-92. At UALD, a CAP is "not a form of discipline and is designed specifically to help [investigators] improve in [their] analysis of discrimination complaints." Id. at 91. As part of the CAP, Kline was required to (1) submit her work to the Fair Housing Coordinator prior to submitting it to her case manager; and (2) meet with her case manager more often. Id. at 92. At the end of the CAP period, Golom informed Kline in writing that while the work product she submitted during the CAP period "improved a great deal . . ., lingering concerns about conceptual and analytical concepts" remained. Id. at 94. As a result, Kline's CAP was extended for forty-five more days. Id.

On March 1, 2001, Kline was given a Notice of Intent to Discipline, in which she was informed that UALD intended to issue a formal letter of reprimand for her continued failure to properly analyze discrimination complaints without the assistance of her supervisors. Id. at 102. UALD issued the formal letter of reprimand on March 14, 2001. Id. at 108-09.

3.    *EEOC Complaint*

In November 2002, Kline and three other female investigators filed a sexual harassment complaint with the EEOC against then Director Gallegos. Id. at 588-89. As a result of this complaint, Gallegos resigned from his position as director. Id. In June

4

2003, Kline and UALD reached a settlement agreement. In the agreement, Kline agreed that she would not file suit against UALD for claims arising out of her EEOC complaint, and UALD agreed that it would not discriminate or retaliate against Kline "as a result of filing [the EEOC] charge" against Gallegos. Id. at 445.

### 4. Harold Stephens

Sherrie Hayashi became the UALD Director in June 2003. Shortly thereafter, Harold Stephens became Kline's case manager. Id. at 164. Stephens apparently had concerns regarding Kline's performance because in January 2004, UALD placed her on another CAP, which she successfully completed. Id. at 168. In August 2004, Stephens placed a memo in Kline's file indicating that she was experiencing "difficulty in completing her determinations in an administratively acceptable manner" and had been "exhibit[ing] . . . a resistance to suggestions." Id. at 115. Stephens also indicated that he had spoken with Kline and explained to her that "the quality of her work [was] unacceptable for an investigator of her longevity." Id. at 115-16.

From September 2004 to March 2005, Kline was again placed on a CAP to assist her in becoming "a more proficient writer and [to] aid [her] in the required analysis" of her investigative work. Id. at 118-20. As part of her CAP requirements, Kline was required to meet with Stephens on the second and fourth Wednesday of every month to discuss her work. Id. at 119. She was also required to "complet[e] a critical analysis and legal writing course at an institution to be agreed upon" at a later date. Id. Kline was required to complete the course by February 28, 2005. Id.

5

Although this CAP did not require Kline to receive assistance from her co-workers, the record indicates that Stephens assigned a fellow investigator named Ashlee Jolley to help Kline improve her writing. Id. at 228. In an email to Stephens regarding her assistance to Kline, Jolley noted that while she had "seen some definite improvements" in Kline's work, Kline was still making "continuous errors" and having a difficult time applying the proper analysis. Id. Jolley also informed Stephens that the most recent work Kline had given her was "not very coherent or organized." Id.

Because UALD had some difficulty identifying a legal writing class for Kline to attend, it extended her CAP through May 2005. Id. at 122-23. In addition, UALD added new requirements to her CAP and ordered her to attend additional training meetings and meet with a licenced attorney who was assigned to assist her with her cases. Id. at 156-62. Kline eventually completed all of these requirements, including the legal writing class, although she claims that the attorney assigned to work with her "did not understand what Mr. Stephens wanted." Aplt. Br. at 21.

In March 2005, Stephens sent an email to Kline informing her that rather than meet with her and instruct her to re-write an assignment, he re-wrote the assignment and sent it to Director Hayashi for approval. App. at 127. Stephens also informed Kline that she needed to "begin thinking in a more linear, analytical fashion." Id. He concluded by telling her: "[i]t is absolutely critical over the next two months that you begin showing significant improvement in your ability to think critically and produce a logically supportable determination." Id.

6

According to UALD, Kline's work product did not improve enough over this two month period. Id. at 157, 170. On June 3, 2005, Stephens and Hayashi gave Kline her annual performance review. Id. at 225. Stephens and Hayashi indicated in the report that Kline had "been unable to develop reasonable expertise in [the] functional areas" of her job and they gave her an "unsuccessful" performance rating. Id. On July 11, 2005, Hayashi issued Kline a Notice of Intent to Dismiss. Id. at 170-71. Kline initially filed an administrative grievance regarding her proposed dismissal, but she chose to forgo the administrative hearing and resigned from her employment position in August 2005.[1] Id. at 172.

## B.    UALD's Alleged Mistreatment of Kline

Kline alleges that shortly after she and three other women filed the EEOC charges against Gallegos, they "had their productivity standards raised and their flex schedule and telecommute options . . . taken away by management." Aplt. Br. at 10-11. She further alleges that Gallegos, Stephens, and another manager named Bel Randall began excluding the four women from department meetings, instructing UALD employees to ostracize them, and giving their work greater scrutiny. App. at 364, 380.

Of these case managers, Kline alleges Stephens mistreated her the most following her settlement with UALD. Kline alleges Stephens unfairly scrutinized her work and

---

[1] Although she admits resigning from her employment, Kline alleges that her employment was effectively terminated once she received the Notice of Intent to Dismiss. In ruling on UALD's motion for summary judgment, the district court assumed Kline had been terminated. In our review of the district court's ruling, we will make the same assumption.

7

used his position as case manager to punish her. According to Kline, when she confronted Stephens about the excessive noise other employees were making outside her office, he promptly issued a memo criticizing her work. Id. at 218, 573. Kline also alleges she was placed on CAP in January 2004 not because of problems with her work performance, but because Stephens was still upset about her EEOC complaint against Gallegos. Id. at 454. Finally, Kline alleges Stephens verbally mistreated her by yelling at her in front of other employees, calling her "stupid" and "incompetent", and going out of his way to harass her at staff meetings. Id. at 548-51; 577-79.

On one occasion, Kline directly approached Stephens about the way he was treating her. In March 2005, the day after Stephens told Kline that it was "absolutely critical" that she improve her writing, Kline wrote a memo to Stephens in which she levied two complaints against him. Id. at 127-28. First, Kline complained about the constant noise level around her office and asked Stephens to require that the other employees not socialize so loudly around her work area. Id. at 129. Kline also mentioned a time when Stephens, along with another co-worker named Julie, teased Kline for always asking others not to be so loud around her. Id.

Second, Kline informed Stephens that she was uncomfortable with the number of sexual innuendos she heard around the office, including offensive sexual jokes between Stephens and Julie. Id. Kline also mentioned an offensive comment Stephens made to her directly. Id. at 132. Kline recalled an incident in which she was in Stephens' office searching for some files. After she thanked Stephens for letting her search through his

8

office, he responded "you can fondle my files any time." Id. In her deposition, Kline also mentioned another incident involving Stephens. One day Kline asked him "so what does someone have to do to work in the [the] wage and hour [department]?" Id. at 244. Stephens allegedly responded: "why don't you come over and sit on my lap and see what comes up?" Id.

Stephens immediately notified Director Hayashi of Kline's accusations. Hayashi investigated these incidents by interviewing Kline, Stephens, and other employees. Id. at 156, 171. In April 2005, Hayashi wrote a memo to Stephens in which she (1) reiterated UALD's policy regarding communication, inappropriate jokes, age and gender related comments, and general harassment; (2) instructed him to "correct deficiencies in [Kline's] work" in a manner "conducive to appropriate management demeanor"; and (3) requested that he attend an upcoming management class to help him "effectively communicate with persons of various communication styles." Id. at 134-35. In her deposition, Kline admitted that she did not hear Stephens make any inappropriate comments after Director Hayashi issued her memo to Stephens. She did testify, however, that she tried to "avoid [Stephens] as much as [she] could." Id. at 247.

C.    *Thomas Hauser*

Thomas Hauser is the only male investigator at UALD. Hauser testified that in September 2004, when Kline was again placed on CAP, Stephens came to Hauser and told him that he would also be placed on CAP. When Hauser asked Stephens what was wrong with his work product, Stephens allegedly responded: "Well, I have to do this

9

because I wrote up Carol and I don't want her to think that I'm singling her out." Id. at 607-08. Hauser testified that his CAP stated that he was to have weekly meetings with Stephens regarding his work, but that the meetings "never happened." Id. at 608. According to Hauser, his CAP was "on paper only." Id.

Hauser also testified that he believed Stephens was "zeroing in" on Kline and treating her more harshly than the other investigators. In his deposition, Hauser testified that Stephens made "caustic comments or harsh comments" regarding Kline's work in his written performance evaluations. Id. at 598. According to Hauser, Stephens would "on several occasions . . . stand at Kline's cubicle and say things . . . that should have been said in [his] office." Id. at 598-99. Hauser testified that he did not "remember specific comments" made by Stephens, but he felt that what Stephens said was inappropriate. Id. at 599. Hauser also testified that he spoke with Director Hayashi "on several occasions" regarding the fact that he thought Stephens was "targeting" Kline. Id. at 601-02. Hauser further testified that after Kline resigned, Stephens began berating another female employee, Joan Carter, by "criticiz[ing] her reports . . . and her performance issues" in an "unprofessional" manner. Id. at 604.

*Procedural History*

In February 2008, Kline filed suit against UALD in federal district court alleging claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000. Kline alleged claims for (1) hostile work environment; (2) sex discrimination; (3) retaliation; and (4) breach of the settlement contract. UALD moved for summary judgment on all of Kline's

10

claims. The district court granted UALD's motion for summary judgment, concluding that "there [was] not enough evidence in the record for a rational trier of fact to find that Ms. Kline was targeted because she is a woman or because she had lodged discrimination complaints." App. at 842-856.

**II**

*Standard of Review*

We review a district court's grant of summary judgment *de novo*, applying the same legal standards used by the district court in addressing motions for summary judgment. Carpenter v. Boeing Co., 456 F.3d 1183, 1192 (10th Cir. 2006). Summary judgment is appropriate, when construing the record in the light most favorable to the non-moving party, "there is no genuine issue of material fact and one party is entitled to judgment as a matter of law." MediaNews Grp., Inc. v. McCarthey, 494 F.3d 1254, 1261 (10th Cir. 2007).

*Analysis*

Title VII prohibits an employer from "discriminat[ing] against any individual with respect to . . . compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e2(a)(1). Kline brings three claims under Title VII: (1) hostile work environment based on sex; (2) sex discrimination; and (3) retaliation.

A.      *Hostile Work Environment*

Title VII's prohibition on discrimination "prohibits [an employer] from subjecting

11

an employee to a hostile work environment." Meritor Sav. Bank, FSB v. Vinson, 477

U.S. 57, 64 (1986). Here, Kline alleges she was subjected to a hostile work environment

because of her gender.[2] Aplt. Br. at 35. To establish that a sexual hostile work

environment existed, a plaintiff must prove: (1) she is a member of a protected group; (2)

she was subject to unwelcome harassment; (3) the harassment was based on gender; and

(4) due to the harassment's severity or pervasiveness, the harassment altered a term,

condition, or privilege of the plaintiff's employment and created an abusive working

environment. Harsco Corp. v. Renner, 475 F.3d 1179, 1186 (10th Cir. 2007).

A hostile work environment claim survives summary judgment only when the

plaintiff presents sufficient evidence indicating that "the workplace [was] permeated with

discriminatory intimidation, ridicule, and insult" such that it "create[d] an abusive

working environment." Penry v. Fed. Home Loan Bank, 155 F.3d 1257, 1261 (10th Cir.

1998). In making this determination, courts are to consider "the frequency of the

discriminatory conduct; its severity; whether it is physically threatening or humiliating, or

a mere offensive utterance; and whether it unreasonably interferes with an employee's

---

[2] In her opening brief, Kline asks this court to consider her hostile work environment claim as a claim based on retaliation as well. Kline admits that causes of action for retaliatory hostile work environment have not been formally recognized by the Tenth Circuit, but she notes that at least two district courts have concluded that such a claim does arise under Title VII. See King v. Salazar, 2009 WL 1300740 (D.N.M 2009); Jones v. Wichita State Univ., 528 F. Supp. 1196, 1218 (Dist. Ct. Kan. 2007). We decline to address this argument because Kline never raised it in the district court. See United States v. Dewitt, 946 F.2d 1497, 1499 (10th Cir. 1991) (The court does "not consider issues which are raised for the first time on appeal unless a party demonstrates an impediment which prevented raising the argument below.").

12

work performance." Trujillo v. Univ. of Colo. Health Sci. Ctr., 157 F.3d 1211, 1214 (10th Cir. 1998). In order to reach the level of a hostile work environment, the misconduct must amount to more than "a few isolated incidents"; instead a plaintiff must show "pervasive or severe harassment." Id. (citation omitted).

The district court concluded that Kline brought forth enough evidence to create a genuine issue of material fact regarding whether Stephens created a hostile work environment. App. at 854. Nonetheless, the court granted UALD's motion for summary judgment because Kline "provided no evidence that [she] was discriminated against because of her sex." Id. Kline argues the district court erred because the following evidence indicates that she was mistreated because of her gender: (1) the two inappropriate sexual comments Stephens made directly to her; (2) the inappropriate sexual comments she overheard around the office; (3) Hauser's testimony that Stephens was unduly harsh in his evaluation of her work; (4) Hauser's testimony that Stephens made comments to her in public that should have been made in his office; (5) Hauser's testimony regarding why Stephens placed him on CAP; and (6) Hauser's testimony that after Kline left, Stephens began to harass another female employee. Id.

We are not persuaded by these arguments, and we conclude that Kline did not present sufficient evidence to indicate that she suffered an abusive working environment because of her gender. In analyzing this issue, we note that Kline's evidence comes from two sources: (1) Hauser's testimony regarding what he observed around the office, and (2) her own testimony regarding how she was treated at work.

13

## 1. *Hauser's Testimony*

We conclude that Hauser's testimony does not create a genuine issue of material fact regarding whether Kline was mistreated because of her gender. First, Hauser testified that Stephens "zeroed in" on Kline by making "caustic" and "harsh" comments regarding her work in his written performance reviews. Id. at 598-99. This testimony, however, does not establish that Stephens' alleged mistreatment of Kline was related to her gender. The record indicates that Stephens harshly criticized Kline's work not because she is a woman, but because her work product was deficient. In addition to Stephens' own complaints regarding Kline's performance, Kline's two previous supervisors both repeatedly noted the shortcomings in her written work. Id. at 62-66; 86-89. Also, Ashlee Jolley, the co-worker assigned to help Kline, told Stephens that Kline's work product was still "not very coherent or organized." Id. at 228. Finally, Director Hayashi testified that she made the decision to terminate Kline based on her poor work product. Id. at 170-71. Thus, while Hauser testified that Stephens was unduly critical of Kline, the record indicates that Stephens' criticism was related to her work performance, not her gender.

Second, Hauser's testimony that Stephens made inappropriate comments to Kline at her cubicle does not establish that gender discrimination motivated Stephens' actions. For one, Hauser does not indicate exactly what Stephens said to Kline. He admits that he does not "remember specific comments"—he simply testified that the things Stephens said "should have been handled in the office." Id. at 599. Without knowing what

14

Stephens said, we cannot simply assume that his comments were inappropriate or a form of sexual harassment. We therefore conclude that Hauser's testimony regarding the incidents at Kline's cubicle do not support a claim for gender-based hostile work environment.

Third, we conclude that Hauser's testimony that Stephens put him on CAP so that Kline was not singled out does not reasonably indicate that Kline was subjected to a hostile work environment because of her gender. Kline essentially argues that since Stephens did not want her to be the only employee placed on CAP, he must have put Hauser on CAP to cover up for the fact that he was punishing Kline because of her gender. Such an interpretation of Hauser's testimony, however, requires us to infer facts that are not supported by the record. Even taking Hauser's testimony as true, Hauser never stated that Stephens told him he placed Kline on CAP because of her gender; instead, Stephens told Hauser that he was placing him on CAP so Kline would not appear to be singled out. Id. at 607-08. Further, the record indicates that what set Kline apart from the other investigators was her poor work performance. In addition to the fact that Kline was placed on CAP multiple times because of her poor work product, Director Hayashi testified that none of the other investigators "experienced the degree of difficulty in meeting performance expectations" that Kline did. Id. at 170-71. Thus, while Kline asks us to conclude that Stephens placed Hauser on CAP so he could cover up his sexist motives, the facts indicate that Kline had greater difficulty in satisfactorily completing her work than any other employee.

15

Finally, Hauser testified that soon after Kline resigned from her position, Stephens began mistreating Joan Carter, another female investigator. We are not persuaded that this testimony creates a material factual dispute regarding whether Stephens harassed Kline because of her gender. Even if Stephens' mistreatment of Carter could lead a reasonable juror to infer that he similarly mistreated Kline, Hauser's testimony is inconclusive. Hauser testified only that Stephens mistreated Carter by "criticiz[ing] her reports and . . . her performance issues" in an "unprofessional" manner. Id. at 604. Like Hauser's testimony regarding Stephens' criticism of Kline's work, this testimony indicates that Stephens was not pleased with Carter's work product, not that his actions were motivated by gender discrimination. More important than Hauser's testimony, however, is the fact that Kline did not present to the district court any other evidence of Stephens' alleged mistreatment of Carter. Kline did not introduce Carter's testimony on this matter or whether Carter complained to UALD management or her co-workers about the way Stephens treated her. For these reasons, Hauser's vague assertion that Stephens was unduly critical of Carter does not indicate that Kline was mistreated because of her gender.

2.      *Kline's Testimony Regarding Workplace Comments*

Kline testified regarding two inappropriate comments Stephens made, directly to her, and comments she overheard him make to others. Stephens does not dispute that he made two very inappropriate comments directly to Kline. In addition, the sexually charged comments Kline apparently overheard around the office were clearly

16

inappropriate, even if they were not directed at her. While we obviously do not condone such activity, two inappropriate jokes and a few overheard comments which contained sexual innuendo are not severe or pervasive enough to create a hostile work environment. Trujillo, 157 F.3d at 1214 (holding that federal law "does not guarantee a utopian workplace or even a pleasant one") (citation omitted). Our conclusion is further bolstered by the fact that Stephens took Kline's complaints about his conduct seriously. He immediately informed Director Hayashi of Kline's complaints and, as Kline admits, never made any other inappropriate comments to her. For these reasons, we conclude that Stephens' sexually charged comments were not pervasive or severe enough to create a material factual dispute regarding Kline's gender-based hostile work environment claim.

*B.* *Sexual Discrimination*

Kline also alleges UALD unlawfully discriminated against her based on her gender by terminating her employment. Because Kline seeks to prove discrimination by indirect or circumstantial evidence, we apply the McDonnell Douglas burden-shifting analysis. Trans World Airlines, Inc. v. Thurston, 469 U.S. 111 (1985). Under this analysis, the plaintiff has the initial burden of proving a prima facie case of discrimination by a preponderance of the evidence. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). If the plaintiff puts forth a prima facie case of discrimination, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." Id. If the plaintiff carries this burden, he or she must then prove by a preponderance of the evidence that the reasons offered by the defendant for its

17

employment actions were actually a pretext for discrimination.  Id. at 804.

In order to prove a prima facie case of sex discrimination, Kline must prove that (1) she is a member of a protected class; (2) her job performance was satisfactory; (3) UALD took an adverse employment action against her; and (4) similarly situated employees were treated differently from her.  Goodwin v. Gen. Motors Corp., 275 F.3d 1005, 1012 (10th Cir. 2002).  The district court assumed for the sake of argument that Kline brought forth sufficient evidence to establish a prima facie case of sex discrimination.  Accordingly, it considered (1) whether UALD brought forth evidence of a non-discriminatory reason for terminating Kline's employment; and (2) whether Kline presented sufficient evidence for a reasonable juror to conclude that UALD's stated reason for terminating her employment was pretextual.

*1.      Non-Discriminatory Reason for Terminating Kline's Employment*

The district court concluded that UALD brought forth enough evidence to indicate that its stated reason for terminating Kline's employment was not discriminatory, but rather was due to her poor work performance.  We agree with the district court's conclusion because the record shows that Kline had a lengthy history of mediocre work performance prior to her termination.

In 1999 and 2000, Deidre Marlowe documented problems with Kline's work performance multiple times.  In addition to noting the numerous "factual and analytical gaps" in Kline's writing, she also informed Director Gallegos that she did not "trust her analysis."  App. at 65-66, 68.  From 2000 to 2002, John Golom documented various

18

shortcomings with Kline's work, and he also met with her to discuss how she could improve her writing. Id. at 86, 89. During this time period, Kline was placed on a CAP to help her improve her writing abilities, but the CAP was extended because of "lingering concerns" about the quality of her work. Id. at 94. In addition, while Golom was still Kline's supervisor, UALD issued Kline a formal reprimand for failing to properly complete her assignments as a UALD investigator. Id. at 108-09. Finally, from 2003 to 2005, Stephens, like Marlowe and Golom, reported numerous shortcomings in Kline's work. Stephens concluded on multiple occasions that Kline's work was "unacceptable" and that she need to "begin showing significant improvement" in her work product. Id. at 115-16, 127.

In addition to the testimony of Kline's first three cases managers, Director Hayashi testified that she read one of Kline's memos and that it "made no sense." Id. at 169. Hayashi also testified that she decided to issue the Notice of Intent to Dismiss because Kline repeatedly failed to properly complete her work at the expected level and because no other investigators, male or female, "experienced the degree of difficulty in meeting performance expectations" that she did. Id. at 171. Finally, Ashlee Jolley, the co-worker assigned to help Kline improve her work product, reported that Kline was making "continuous errors" and was submitting writing assignments that were "not very coherent or organized." Id. at 228. Given that numerous UALD employees documented the problems with Kline's work product, we conclude that the district was correct in finding that UALD had shown a non-discriminatory reason for terminating her employment. See

19

Bryant v. Farmers Ins., 432 F.3d 1114, 1125 (10th Cir. 2005) ("Poor performance is a quintessentially legitimate and nondiscriminatory reason for termination.").

        2.      *Pretext*

The district court also granted summary judgment on Kline's sex discrimination claim because she failed to present evidence indicating that UALD's stated reason for terminating her employment was pretextual. A plaintiff can demonstrate pretext by showing "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's . . . reasons for its action," which "a reasonable factfinder could rationally find . . . unworthy of credence." Morgan v. Hilti, Inc., 108 F.3d 1319, 1323 (10th Cir. 1997).

Kline argues the district court erred in granting summary judgment on her sex discrimination claim because a genuine factual dispute exists regarding whether UALD terminated her employment for pretextual reasons. In support of this assertion, Kline points to the following as evidence of pretext: (1) Hayashi's inconsistent testimony regarding why she issued the Notice of Intent to Dismiss; (2) the manner in which UALD carried out her CAPs; and (3) Stephens' inconsistent directions regarding her work. We are not persuaded by any of these assertions.

First, Kline argues that Hayashi's testimony regarding why she terminated her employment is both inconsistent and implausible. According to Kline, this is evident by the fact that Hayashi testified to directly reviewing only one of Kline's memos (in January 2004) and that she did not issue the Notice of Intent to Dismiss until July 2005,

20

eighteen months after she read the alleged poorly written memo. We disagree. First, Hayashi testified that she read Kline's memo in 2004 at Kline's request, and there is no evidence that this was the only work product of Kline's that Hayashi ever read. More important, however, is the fact that as UALD Director, Hayashi relies on the observations and reports of her case managers who directly oversee the work of the investigators. The record indicates that all three cases managers—Marlowe, Golom, and Stephens—informed the UALD Director that Kline was having significant problems completing her work in a satisfactory manner. Thus, while Kline argues that Hayashi terminated her employment based on a memo she wrote eighteen months before her termination, the record indicates that Hayashi made the decision to issue the notice of dismissal based on reports from the case managers and Kline's "failure to improve the long-noted deficiencies" in her work. App. at 168-70.

Kline also argues that the manner in which UALD carried out her CAPs indicates that she was terminated for pretextual reasons. Kline alleges she repeatedly requested legal writing classes so that she could improve her writing, but that her requests were "either ignored or rejected by UALD management." Aplt. Br. at 55. She also claims that her CAPs required her to meet with Stephens regularly, but that he refused to meet with her. We are not persuaded by these arguments. First, Kline's assertion that UALD ignored her requests for legal writing classes is entirely without merit. Kline did not initially request access to these classes: her September 2004 CAP required that she complete a legal training course by the end of February 2005. Although Kline sent two

21

emails to Stephens asking for information on a course so she could complete her CAP on time, App. at 467-68, she did not (as she implies) request to enroll in a legal writing program simply out of a desire to improve her writing.

Further, the record indicates that UALD did not ignore Kline's request for access to a legal writing class. Because it had some trouble identifying the proper legal training course, UALD extended Kline's CAP to May 2005 so she could complete the required course—which she ultimately did. Moreover, UALD provided Kline with other improvement opportunities: it required her to attend additional training meetings, it assigned an attorney to assist her with her cases, and it assigned Ashlee Jolley, a fellow investigator, to help her with her writing. App. at 156-62, 228. Thus, despite Kline's assertions to the contrary, UALD did not ignore her requests for training, and its actions on this matter do not reveal evidence of pretext.

Kline also argues that Stephens refused to meet with her regularly, as required by her CAP. Even taking this assertion as true, however, it does not establish a genuine factual dispute regarding whether UALD terminated Kline's employment for pretextual reasons. First, Hauser testified that Stephens was supposed to meet with him after he was placed on CAP, but that Stephens never met with him either. Thus, based on the record, it appears that it was not uncommon for Stephens to not actually meet with his investigators as contemplated in the CAPs. More important, however, is the fact that Kline's poor work performance since the time she was hired is very well documented. Multiple supervisors, both men and women, reported that Kline's work product was poor,

and in response, UALD (1) assigned multiple people to help Kline and (2) required her to enroll in classes, attend workshops, and receive one-on-one help. In the end, however, Kline's work product did not improve. Given this fact, we conclude that Stephens' alleged failure to meet with Kline regularly does not reasonably indicate that UALD's stated reason for terminating her employment was pretextual.

Finally, Kline argues that the fact that Stephens provided her with "inconsistent directions" regarding her work is evidence of pretext. Even assuming Kline's allegation is true and Stephens provided inconsistent directions, the fact remains that numerous other UALD supervisors and employees, Marlowe, Golom, Hayashi, and Jolley reported that Kline had problems consistently following directions and properly completing her written work. Because Kline's problems were not limited to just her work with Stephens, her allegations regarding his inconsistent directions would not persuade a reasonable juror to find that UALD's stated reason for terminating her employment was pretextual.

*C.*     *Retaliation*

Kline also alleges UALD violated Title VII by retaliating against her for filing an EEOC complaint against former-Director Gallegos. Kline alleges UALD retaliated against her by placing her on CAPs, subjecting her to Stephens' "unprofessional and excessive tirades," and eventually terminating her employment. In order to prove a prima facie case of retaliation, Kline must demonstrate (1) that she engaged in protected opposition to discrimination; (2) that a reasonable employee would have found the challenged action materially adverse; and (3) that a causal connection existed between the

23

protected activity and the material adverse action.  Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1202 (10th Cir. 2006).

As with Kline's sex discrimination claim, the district court assumed Kline brought forth enough evidence to establish a prima facie case of retaliation.  The court granted UALD's motion for summary judgment on Kline's retaliation claim, concluding (1) that UALD brought forth sufficient evidence of a non-retaliatory reason for terminating Kline's employment, and (2) that Kline did not provide evidence indicating that this stated reason was pretextual.

We affirm the district court's grant of UALD's motion for summary judgment on this claim.  As previously noted, we conclude based on the undisputed evidence that UALD had a non-discriminatory reason for terminating Kline's employment— namely, her poor work performance over the course of several years.  We also affirm the district court's conclusion that Kline did not bring forth sufficient evidence indicating that UALD's stated reason for terminating her employment was pretextual.  First, Kline argues that she met this burden because the same arguments for finding pretext as to her sex discrimination claim apply to her retaliation claim.  We disagree with this argument and conclude, for the reasons stated above, that (1) Hayashi's testimony regarding her reasons for terminating Kline's employment, (2) the manner in which UALD carried out her CAPs, and (3) Stephens' allegedly inconsistent instructions regarding her work product do not indicate that Kline was terminated for pretextual reasons.

Second, Kline argues that Director Hayashi's response to her complaints regarding

24

Stephens' behavior reveals evidence of pretext. According to Kline, when she informed Hayashi of Stephens' improper behavior and overall mistreatment of her, Hayashi did no more than engage in a "sham investigation." Aplt. Br. at 66. Essentially, Kline argues that the fact that Hayashi did not take Kline's accusations seriously indicate that she condoned Stephens' mistreatment of her, which was motivated by a desire to retaliate against her for filing the EEOC complaint against Gallegos.

We are not persuaded by this argument because Kline has brought forth no evidence to indicate that Director Hayashi conducted a sham investigation or otherwise did not take Kline's accusations seriously. For one, Kline does nothing more than simply allege that Hayashi did not adequately investigate her complaint. She points to no testimonial or documentary evidence in the record to support this broad assertion. More important, the evidence concerning Hayashi's investigation disproves Kline's claim. After interviewing Kline, Stephens, and other employees, Hayashi wrote a letter to Stephens explaining her "clear expectations" that he follow UALD policy regarding communication, inappropriate jokes, age and gender related comments, and general harassment. App. at 134-35. Hayashi also informed Stephens that he needed to address Kline's work deficiencies in a manner "conducive to appropriate management demeanor." Id. at 135. Finally, Hayashi asked Stephens to attend an upcoming management class that she believed would help him "effectively communicate with persons of various communication styles." Id. Given that Hayashi interviewed Kline, Stephens, and other employees and then instructed Stephens to cease his inappropriate

conduct and requested that he attend a class to help him communicate properly, we conclude that Hayashi adequately investigated Kline's accusations and that Hayashi's conduct regarding this matter does not reveal evidence of pretext.

*D.     Breach of Contract*

Finally, Kline alleges the district court erred in granting summary judgment on her breach of contract claim because, contrary to its written promise not to retaliate against her for filing an EEOC claim against then-Director Gallegos, UALD terminated her employment in retaliation against her. Because we conclude as a matter of law that UALD did not retaliate against Kline, we affirm the district court's ruling that UALD did not breach the settlement agreement.

## III

The judgment of the district court is AFFIRMED.

Entered for the Court

Mary Beck Briscoe
Chief Judge

26